STATE of Missouri, Respondent,

v.

Monte R. RODEN, Appellant.

No. WD 33648.

Missouri Court of Appeals,
Western District.

May 15, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied July 3,. 1984.

James W. Fletcher, Public Defender, Joseph H. Locascio, Sp. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P.J., and CLARK and BERREY, JJ.

BERREY, Judge.

Monte R. Roden was convicted by a jury in the Circuit Court of Jackson County of first degree burglary § 569.160.1, RSMo 1978, and of attempted forcible rape § 564.-

011.1, RSMo 1978, § 566.030.1(1) RSMo Supp.1980. Accordingly, he was sentenced to ten years imprisonment for burglary and to twenty years imprisonment for attempted forcible rape. Roden appeals from the attempted rape conviction claiming thirteen errors, of which four have been preserved. For the reasons set forth below judgment is affirmed.

On the night of July 13, 1981, Susan Watkins resided at apartment # 4, 603 West 39th Terrace, Kansas City, Missouri. This apartment was on the first floor and perhaps as a consequence thereof Watkins had installed a second lock on her front door. Watkins kept one key to the lock she had installed and gave the only other key to the apartment manager, Sheila Inman. Inman also possessed the master key to the other lock on Watkins' door.

Watkins turned off the lights and, it being a summer evening, went to bed nude. Shortly after dozing off she was awakened by a hand on her body. She sat up and swung her arms. Someone jumped on her back; rolling over she grabbed her assailant. The room was dark and she couldn't see. Watkins asked repeatedly "who is it?" as she struggled with the man on her bed. He told her to be quiet or else he would kill her. They wrestled and eventually fell off the bed. Watkins' head landed in his lap and he tried to smother her. Watkins did not feel any clothing on the assailant. Leaning against the wall for support, she was finally able to stand. Her assailant then punched her in the face. Watkins heard him leave as the front door slammed.

After turning on the apartment lights she went out the front door where she saw a man in the foyer. He was nude, leaning against the wall and putting on a pair of yellow shorts. The lights were off, but light from Watkins' apartment, a full moon, and street lamps shone into the foyer. Watkins recognized the man as someone she had seen before. She asked who he was and he responded by approaching and slapping her. They fought again, Watkins was knocked to the floor, and she

grabbed his legs. Slipping from Watkins' grasp, he dashed out the building's front door.

Officers Christensen and McCart of the Kansas City Police Department were patrolling the area of 39th Terrace and Pennsylvania when they heard screams. They determined that the screams emitted from the apartment building located at 603 West 39th Terrace. The officers observed movement in the apartment's hallway. Officer Christensen stopped the car, exited and then ran toward the hallway while Officer McCart shined the patrol car's spotlight on the area. Officer Christensen observed a white male clad in yellow or beige shorts bolt from the front door and run west.

Watkins chased the intruder out of the apartment building, but stopped when she heard the police yell "Stop."

Officer McCart exited the vehicle and began chasing the suspect. Both Officers Christensen and McCart lost sight of the suspect briefly. Officer McCart returned to the vehicle and radioed for a canine unit. The unit arrived less than five minutes later. The canine unit discovered the suspect hiding under some shrubbery. Watkins was escorted to the location and identified the suspect, clad only in yellow shorts, as Sheila Inman's boyfriend. At trial, Watkins identified Monte Roden as the man she saw that evening in the foyer and hiding under the shrubbery.

After Roden's arrest, Officers Christensen, McCart, and Detective Wilson interviewed Watkins in the police car. They then re-entered the apartment building and conducted an investigation of Watkins' apartment which revealed that no forceable entry had been made. Detective Wilson then contacted Sheila Inman and inquired if she had keys for Watkins' apartment. Inman replied that she did, showed the keys to Detective Wilson, and further explained that there was a second set of keys kept on a pegboard in the basement. Subsequently, Detective Wilson, Inman, and Watkins descended to the basement where they saw that the keys for Watkins' apartment were missing from the pegboard.

Sheila Inman stated that Roden had lived with her in the apartment complex since January, 1981. He performed ground maintenance at the complex and, consequently, had access to the storage area in which the pegboard was located.

In his defense, Roden testified the following occurred on the night of the offense. He and Inman had spent the evening celebrating the latter's birthday by frequenting several drinking establishments in the Westport area. They arrived at the apartment complex at approximately 11:00 p.m. Inman was intoxicated and both she and Roden retired to bed. Roden was awakened by screaming, he alighted from bed, put on a pair of swimming trunks, and followed the screams to Watkins' apartment. In the foyer Roden saw a man dressed in shorts and tennis shoes run out the front door. Roden was then grabbed from behind by Watkins. Watkins screamed that she was going to kill him, and he replied twice that he was trying to help her. He did not strike Watkins. Roden then broke from Watkins' grasp and ran out the front door. He ran into an alley when he noticed police officers giving chase. Roden denied being in Watkins' apartment and attempting to rape her.

Roden asserts the trial court erred in submitting the case to the jury because the evidence did not indicate a specific intent to have sexual intercourse by forcible compulsion.

■ Specific intent to engage in sexual intercourse without consent is an essential element of the crime of attempted rape. *See State v. Selle*, 367 S.W.2d 522, 527 (Mo.1963). It is the unusual situation when there is direct evidence of the intent of a person charged with attempted rape. Indeed, intent may, and generally must, be established by circumstantial evidence, for as a rule it is not susceptible of direct proof. *State v. Petrechko*, 486 S.W.2d 217, 218 (Mo.1972); *see State v. Selle, supra*, at 527. The evidence need not establish intent as a matter of law; it is sufficient that it authorizes such a finding by the jury. *State v. Petrechko, supra*, at 219.

■ From the evidence adduced at trial a jury could have reasonably believed that Roden intended to rape Watkins. Watkins testified she did not feel any clothing on Roden while they wrestled in her apartment. In the foyer she saw him putting on a pair of yellow shorts. The jury could infer that Roden was naked while in Watkins' apartment. Watkins was also completely nude. She was awakened when Roden placed his hand upon her, though there is no affirmative evidence that he touched her breasts or vagina. While she was in bed Roden jumped on her back. After the ensuing struggle deposited them on the floor, Watkins' head landed in Roden's lap. The foregoing is as indicative of an intent to engage in sexual intercourse as the evidence in *State v. Selle, supra; State v. Shroyer*, 104 Mo. 441, 16 S.W. 286 (1891); and *State v. Smith*, 80 Mo. 516 (Mo.1883).

In *State v. Selle, supra*, the nineteen-year-old victim had fallen asleep on a couch in the living room. She was awakened when someone began pulling a comforter off of her. Drowsy, and thinking that it was probably her mother, she turned over on her stomach and readjusted the comforter. When it was pulled off of her a second time she realized that it was not her mother and that someone was crouching on the floor. She turned on her side and began to rise when a man leaned over the couch and struck her. She screamed and the man continued hitting her. In response to the ruckus in the living room, her parents quickly descended the stairs from their second floor bedroom. By the time they reached the living room the intruder had fled. The Missouri Supreme Court found such evidence sufficient to sustain Selle's conviction of assault with felonious intent to ravish and rape.

The defendant in *State v. Shroyer, supra*, entered the bedroom in which the fourteen-year-old victim, her three sisters and brother slept. One of the sisters was awakened by a noise, looked around and saw the defendant on his hands and knees in the doorway. The defendant then crawled to the victim and placed his hand

on her arm. The defendant raised partly up, looked about the room, and then began to unfasten his pants. The one sister who was awake screamed and the defendant fled. The Missouri Supreme Court found such evidence sufficient to convict the defendant of assault with intent to rape.

In *State v. Smith, supra,* Smith entered the bedroom in which the victim, her husband and their small child were sleeping. A blanket covering the victim had been removed. When discovered, Smith was on his knees, his hands were resting on each side of the victim and he was clad in only a shirt. The Missouri Supreme Court queried:

> What was he there for? Certainly not to say his *pater noster*. It may be that he thought he could gratify his cumalitive concupiscence by successfully personating the woman's husband. Or, it may be he was so inflamed with fleshly lust as rationally to imagine that, despite the unpropitious surroundings, he could storm the citadel of virtue before successful resistance could snatch his prey from him.

*State v. Smith, supra,* at 519. Again, the evidence was found sufficient to sustain the conviction of assault with intent to rape.

The modern trend demonstrated by *State v. Selle, supra,* is to infer an intent to rape from an assailant's actions. This court, therefore, believes the evidence in the instant case establishes Roden's intent to engage in sexual intercourse with Watkins. Cases from other jurisdictions involving similar facts bear out such a determination. *Accord, Cogman v. State,* 424 So.2d 1355 (Ala.Cr.App.1982); *State v. Kekaualua,* 50 Hawaii 130, 433 P.2d 131 (Hawaii 1967); *Commonwealth v. Simpson,* 462 A.2d 821 (Pa.Super.Ct.1983).

The evidence also establishes Roden's intent to use physical force and threats of death to overcome Watkins' resistance. After awakening Watkins, Roden jumped on her back. Roden wrestled with her and subsequently they fell off the bed. Roden threatened repeatedly to kill

Watkins and in fact attempted to smother her. Clearly, a jury could reasonably find that Roden intended these acts and his statements to overcome Watkins' resistance to have sexual intercourse with him. *See State v. Greer,* 616 S.W.2d 82, 83 (Mo. App.1981).

Roden cites several cases wherein convictions of assault with intent to rape were reversed because the evidence did not show an intent to overcome the victim's resistance through physical force. In those cases the courts determined that the evidence indicated merely solicitation rather than an effort to commit rape. *See State v. Thomas,* 351 Mo. 804, 174 S.W.2d 337, 344–345 (Mo.1943); *State v. Williams,* 324 Mo. 179, 22 S.W.2d 649, 650 (1929); *State v. Osborne,* 246 S.W. 878, 878–879 (Mo. 1922); *State v. McChesney,* 185 S.W. 197, 198–199 (Mo.1916); *State v. Fleming,* 177 S.W. 299, 302 (Mo.1915); *State v. Hamm,* 577 S.W.2d 936, 940 (Mo.App.1979).

The Missouri Supreme Court in *State v. Thomas, supra* at 344, noted the defendant's declaration to have sexual intercourse, lack of physical violence other than "just wrestling," attempts to calm the victim and persuade her to "give in," and professed infatuation with the victim as facts militating against a determination that the defendant sought to physically force sexual intercourse upon the victim. Additionally, the court mentioned the close proximity of two of the victim's minor children at the time of the alleged offense as another significant fact affecting its decision.

In *State v. Williams, supra,* the defendant struck the victim, stated that he would rape her, and pointed an unloaded rifle at her. All of this occurred in the presence of the victim's husband, another couple and three other men. The court stated:

> There was not a moment during any of the occasions when appellant is said to have made an assault upon Irene Williams or announced his purpose to have sexual intercourse with her that she was alone. Bessie Thomas was present each time and at least one of the men was

near by. Unless the bystanders were more brutish and bestial than anything in this record indicates, appellant must have known he had no chance at the time and upon that occasion to have sexual intercourse with this woman, even with her consent, and certainly not against her will and over any resistance she might offer. It is inconceivable that appellant had Mrs. Thomas, the two husbands, and the other men present so terrorized that they would not have interfered. The most we can say of the state's evidence is that it tends to prove an aggravated assault and battery by appellant upon the person of Mrs. Williams, coupled with a coarse and drunken announcement of his lascivious desire.

*State v. Williams, supra,* at 650.

In *State v. Osborne, supra,* the defendant solicited the victim's consent and subsequently grabbed her arms. Determining that the defendant lacked the intent to forcibly compel the victim, the court stated:

It did not appear that defendant intended to have carnal knowledge of prosecutrix at all events, and notwithstanding any resistance on her part. *State v. McChesney* (Mo.Sup) 185 S.W. 197; *State v. Fleming* (Mo.Sup.) 188 S.W. 299, loc. cit. 301, 302; *State v. Espenschied,* 212 Mo. 215, 110 S.W. 1072. Appellant and complainant were upon a public, much-traveled highway in the daytime, and only a short distance from persons, who doubtless could and would have aided her, and yet she made no outcry and neither did she make complaint about her mistreatment for several days thereafter, although on the following day she had another encounter with appellant, at which time, while both of them were on horseback, he undertook to "force" her horse out into the brush. In reading the record no unbiased mind can reach the conclusion that the conduct of appellant was such as to meet the conditions necessary to warrant conviction in such cases. *State v. Goodale,* 210 Mo. 275, 109 S.W. 9; *State v. Patrick,* 107 Mo. 147, 17 S.W. 666; *State v. Riseling,* 186 Mo. 521, 85 S.W. 372. It did not appear that the means employed were apparently adapted to the end, and it was not shown that there was an apparent physical ability to complete the attempt on the part of the attemptor. *State v. Lawhorn,* 250 Mo. 293, loc. cit. 307, 157 S.W. 344; *State v. Tevis,* 234 Mo. 276, loc. cit 284, 136 S.W. 339.

*State v. Osborne, supra,* at 878.

The defendant in *State v. McChesney, supra,* tried to undress the victim, threw her onto the floor, threatened her, and solicited her for $10. The court found the evidence insufficient.

The defendant in *State v. Fleming, supra,* threw the victim onto a cot, placed his hand under her dress, and offered her money. The court concluded that the defendant "did not intend to have sexual intercourse with the prosecutrix except that he first gain her consent." *State v. Fleming, supra,* at 302.

In *State v. Hamm, supra,* the defendant solicited the victim with the promise of employment at his business, lifted her dress, and attempted to remove her garments. Reversing the conviction, the court said:

The record is simply deficient regarding the required proof for assault with intent to rape. The state has failed to prove that the defendant intended to have sexual intercourse with the prosecutrix "forcible and against her will, by using such force as would at all hazards overcome her resistance." *State v. Thomas,* supra; *State v. Williams,* supra; *State v. Osborne,* supra; *State v. McChesney,* supra; *State v. Fleming,* supra. Defendant displayed no array of physical force, *State v. Davis,* supra, or genuine threat of physical violence, *State v. Barteau,* 571 S.W.2d 483 (Mo.App.1978).

The facts of the instant case differ significantly from those in the cases cited by Roden. Here, Roden did not solicit Watkins to engage in sexual intercourse. He threatened Watkins with death and then, as if to illustrate, attempted to smother her. Unlike the defendant in *Hamm,* Roden re-

sorted to both physical force and threats of the ultimate physical violence—death.

Furthermore, except for *Hamm*, the cases cited by Roden represent a view of rape during the early part of this century which differs from the way rape is currently viewed. Roden's actions were sufficiently indicative of an intent to forcibly have sexual intercourse with Watkins. *See State v. Farris*, 639 S.W.2d 279 (Mo.App. 1982); *State v. Greer, supra*, at 83. The evidence is sufficient to sustain Roden's conviction.

Roden's second assignment of error is that the trial court erred in submitting to the jury the verdict directing instruction for attempted rape.

The verdict director for attempt, MAI–CR2d 18.02, provides in part:

> Second, that such conduct was a substantial step toward the commission of the crime of [name of offense with sufficient details to identify person or property involved, e.g., rape upon Susan Doe or burglary of a specific building] and was done for the purpose of committing such [name of offense], ....

Whenever there is a MAI–CR instruction applicable under the law to the facts that instruction shall be given to the exclusion of any other on the same subject. Rule 28.02(c). In the instant case, the verdict directing instruction for attempted rape did not track the form of MAI–CR2d 18.02. Instruction No. 12, in pertinent part, reads as follows:

> Second, that such conduct was a substantial step toward the commission of the crime of attempted rape of Susan V. Watkins, and was done for the purpose of committing such attempted rape, ...

Roden alleges that this instruction permitted the jury to find him guilty of attempted rape if his conduct was a "substantial step" toward the commission of attempted rape and was done for the purpose of committing attempted rape. In short, Roden argues that he was convicted of an attempt to commit an attempted rape.

The trial court's failure to give the pattern verdict directing instruction constituted error, its prejudicial effect to be judicially determined. Rule 28.02. Such an error is deemed prejudicial unless the contrary clearly appears. *State v. Rodgers*, 641 S.W.2d 83, 84 (Mo. banc 1982); *State v. Lasley*, 583 S.W.2d 511, 517 (Mo. banc 1979). Prejudicial error will occur where the jury may have been adversely influenced by an erroneous instruction. *Rodgers, supra*, at 85. To determine if there is prejudicial error in the submission of a particular instruction, all the instructions are read together. *State v. Seddens*, 643 S.W.2d 302, 304 (Mo.App.1982); *State v. Foltz*, 634 S.W.2d 558, 560 (Mo.App. 1982).

Instruction No. 9 reads in pertinent part as follows:

> As to Count I, (burglary), if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about July 14, 1981, at approximately 2:00 a.m., in the County of Jackson, State of Missouri, the defendant knowingly entered unlawfully in an inhabitable structure located at 603 West 39th Street Terrace, Apartment 4, and possessed by Susan V. Watkins, and
>
> Second, that defendant did so for the purpose of *committing the crime of rape therein*.... (emphasis added).

Furthermore, the first paragraph of instruction No. 12 reads as follows:

> As to Count II (attempted rape) if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about July 14, 1981, at approximately 2:00 a.m., in the County of Jackson, State of Missouri, the defendant hit and threatened to kill Susan V. Watkins *in an attempt to have sexual intercourse with her*.... (emphasis added).

Reading the above quoted instructions together and referring to the evidence adduced at trial the jury was not adversely affected by the error. Roden's acts demonstrated an attempt to commit rape, not merely preparation (an attempt to commit

an attempt) to commit rape. Although the second paragraph of instruction No. 12 did not track the MAI–CR verdict director and, therefore, constituted error, such error clearly was not prejudicial given a reading of all the instructions together.

Moreover, Roden has consistently maintained an alibi defense. Roden claims he was awakened by the screams, put on a pair of beige gym trunks, and went into the foyer to investigate. He denies ever being in Watkins' apartment and would have this court infer that he was in the manager's apartment at the time Watkins was attacked. He stated that while in the foyer he had his trunks on and that he did not strike Watkins. In contrast, Watkins testified that the man in the foyer and the man in her apartment were the same, that he was putting on the trunks while in the foyer, and struck her as she approached. "This was a case where the jury could believe either the state's evidence or the defendant's but not both." *State v. Gibson,* 633 S.W.2d 101, 105 (Mo.App.1982). The jury could not believe that Roden was in the manager's apartment when he heard the screams and still believe that he committed the crime. *See State v. Graves,* 588 S.W.2d 495, 498 (Mo. banc 1979). Under such circumstances, the instructional error was not prejudicial. *See State v. Graves, supra,* at 498; *State v. Gibson, supra,* at 105.

Roden's third assignment of error is that the jury instructions did not define the term "substantial step" as used in the verdict director for attempted rape. Section 564.011.1, RSMo 1978, provides that "a person is guilty of an attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense." A "substantial step" is defined as "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." *Id.;* MAI–CR2d 33.01.

Note on Use 3 to MAI–CR2d 18.02, the form verdict director for attempts, provides in part: "Whether the object crime is defined or not, if MAI–CR 2.06 [sic] is given, the following term must be defined in a separate instruction, whether requested or not: 'substantial step.'" MAI–CR 2.06 is the former attempt verdict director.

The failure to define "substantial step" must be deemed prejudicial unless a contrary effect is shown. *State v. Rodgers, supra,* at 84; *State v. Lasley, supra,* at 517. Technical terms which may be misapplied by the jury must be "defined or explained in such a way as to give to the jury a correct idea of their meaning." *State v. Rodgers, supra,* at 85; *State v. Jackson,* 369 S.W.2d 199, 205 (Mo.1963). Failure to define words of common usage which would not confuse the jury does not constitute prejudice. *State v. Rodgers, supra,* at 85; *State v. Abram,* 537 S.W.2d 408, 411 (Mo. banc 1976).

In the instant case "substantial step" was used in an ordinary, not technical, sense. An ordinary juror who observed the presentation of evidence in this case would have given the term the same meaning as in MAI–CR2d 33.01. *See State v. Betts,* 646 S.W.2d 94, 98 (Mo. banc 1983). The failure to define "substantial step" could not have misled the jury. *See State v. Allbritton,* 660 S.W.2d 322, 327 (Mo.App. 1983); *State v. Robinson,* 650 S.W.2d 11, 12 (Mo.App.1983); *State v. Betts, supra,* at 98. *But see State v. Rodgers,* 641 S.W.2d 83, 85 (Mo. banc 1982); *State v. Ogle,* 627 S.W.2d 73, 76 (Mo.App.1981).

Roden's fourth claim of error is that the trial court prohibited cross-examination of Watkins concerning the amount of damages she sought in a civil suit against the apartment complex owner. Roden was allowed to raise the issue of the civil suit because the pecuniary interest involved bore upon Watkins' credibility. *See State v. Pigques,* 310 S.W.2d 942, 947 (Mo.1958); *State v. Roesel,* 574 S.W.2d 944, 945 (Mo.App.1978). However, the trial court may exercise its discretion in limiting the inquiry. *Id.; see also State v. Ofield,* 635 S.W.2d 73, 75 (Mo.App.1982). Here, the civil suit was brought *after* criminal

**58**

charges were filed and settled *before* the criminal case went to trial. The initial sum sought by Watkins, therefore, was irrelevant to the criminal case. The trial court did not abuse its discretion in limiting cross-examination on this issue.

Roden's other nine assignments of error were not preserved in his motion for new trial. Even if these claims had been preserved they are completely without merit and do not amount to error, plain or otherwise.

Affirmed.

All concur.